## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PHASEBIO PHARMACEUTICALS, INC. | Case No. 22-10995 (LSS) |
| Debtor.[1] | **Obj. Deadline: To be determined**<br>**Hearing Date: To be determined** |

### MOTION OF DEBTOR FOR ENTRY OF ORDERS (I)(A) APPROVING THE BIDDING PROCEDURES FOR SALES OF THE DEBTOR'S ASSETS, (B) AUTHORIZING THE DEBTOR TO ENTER INTO THE STALKING HORSE APA AND TO PROVIDE THE STALKING HORSE BID PROTECTIONS THEREUNDER, (C) SCHEDULING AN AUCTION AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (D) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, (E) SCHEDULING A SALE HEARING AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (F) GRANTING RELATED RELIEF; AND (II)(A) APPROVING SALES OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF

PhaseBio Pharmaceuticals, Inc. (the "**Debtor**")[2], as debtor and debtor in possession in the above-captioned chapter 11 case (the "**Chapter 11 Case**"), hereby files this motion (the "**Motion**"), pursuant to sections 105, 363, 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rules 2002-1, 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), seeking entry of:

---

[1]     The last four digits of the Debtor's federal tax identification number are 5697.  The Debtor's principal office is located at 1 Great Valley Parkway, Suite 30, Malvern, Pennsylvania 19355.

[2]     Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the *Declaration of Lawrence Perkins in Support of the Chapter 11 Petition and First Day Motions* [Docket No. 2] (the "**First Day Declaration**").

(i)    an order (the "**Bidding Procedures Order**"), substantially in the form attached hereto as __Exhibit A__:

    (a)    approving the proposed bidding procedures (the "**Bidding Procedures**") in connection with (y) a sale (the "**Sale**," and each, a "**Sale Transaction**") of substantially all of the Debtor's bentracimab-related assets as more fully described in the Stalking Horse APA (defined below) (the "**Acquired Assets**"), and (z) a separate sale without a stalking horse bidder (the "**Additional Sale**") of substantially all of the Debtor's other products, drug candidates, technology, and related assets that are not part of the Acquired Assets (the "**Non-Bentracimab Assets**" and together with the Acquired Assets, the "**Available Assets**"), and in the form attached to the Bidding Procedures Order as __Exhibit 1__;

    (b)    subject to final Court approval at the Sale Hearing (defined below), authorizing and approving the Debtor to enter into and perform under (y) a stalking horse asset purchase agreement consistent with the Bidding Procedures (the "**Stalking Horse APA**"), attached hereto as __Exhibit B__, subject to higher or otherwise better offers submitted in accordance with the Bidding Procedures, and to grant certain Stalking Horse Bid Protections (as defined below) in the form of a break-up fee and expense reimbursement, and (z) an asset purchase agreement (the "**Additional Sale APA**") to be entered into with the Successful Bidder (defined below) for the Non-Bentracimab Assets;

    (c)    scheduling an auction (the "**Auction**") and a sale hearing (the "**Sale Hearing**") in connection with the Sale and the Additional Sale;

    (d)    approving the form and manner of notice of the Auction, the Sale, the Additional Sale, and the Sale Hearing in the form attached to the Bidding Procedures Order as __Exhibit 2__;

    (e)    establishing procedures for the assumption and assignment (the "**Assumption Procedures**") of executory contracts and unexpired leases (y) in connection with the Sale (each, an "**Assigned Contract**," and collectively, the "**Assigned Contracts**"), and (z) separately, in connection with the Additional Sale (each, a "**Separate Assigned Contract**," and collectively, the "**Separate Assigned Contracts**"), and the form and manner of notice thereof in the form attached to the Bidding Procedures Order as __Exhibit 3__;

    (f)    scheduling a hearing to authorize and approve assumption and assignment of the Assigned Contracts in connection with the Sale and the Separate Assigned Contracts in connection with the Additional Sale, including payment of cure amounts (if any) (the "**Assumption/Assignment Hearing**");

(ii)    an order (the "**Sale Order**"), substantially in the form attached hereto as __Exhibit C__:

        (a)      authorizing and approving the Debtor's entry into an asset purchase agreement with the Successful Bidder or Backup Bidder, as applicable, in connection with the Acquired Assets;

        (b)      authorizing the Sale to the party or parties that are the successful bidders at the Auction, free and clear of all liens, claims and encumbrances ("**Encumbrances**"), except for certain assumed liabilities;

        (c)      authorizing and approving the assumption and assignment of the Assigned Contracts in connection with the Sale, including proposed cure amounts (if any);

    (iii)     an order (the "**Additional Sale Order**")[3]:

        (a)      authorizing and approving the Debtor's entry into the Additional Sale APA with the Successful Bidder or Backup Bidder, as applicable, in connection with the Non-Bentracimab Assets;

        (b)      authorizing the Additional Sale to the party or parties that are the successful bidders at the Auction, free and clear of Encumbrances, except for certain assumed liabilities; and

        (c)      authorizing and approving the assumption and assignment of the Separate Assigned Contracts in connection with the Additional Sale, including proposed cure amounts (if any).

In support of this Motion, the Debtor submits the declaration of Alex V. Rohan (the "**Rohan Declaration**") filed contemporaneously herewith, and respectfully states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012 (Sleet, C.J.).  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of this Chapter 11 Case (as defined below) and this Motion is proper in this District under 28 U.S.C. §§ 1408 and 1409.  Pursuant to Local Rule 9013-1(f), the Debtor

---

[3]    The Debtor anticipates that the form of Additional Sale Order to be provided to Acceptable Bidders (defined below) as set forth in the Bidding Procedures will be substantively similar to the Sale Order and will be filed 14-days prior to the Sale Hearing.

consents to the entry of a final order or judgment with respect to this Motion if it is determined that this Court lacks Article III jurisdiction to enter such final order or judgment absent consent of the parties.

2.      The statutory and legal predicates for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rule 6004-1.

## RELEVANT BACKGROUND

3.      On October 23, 2022 (the "**Petition Date**"), the Debtor commenced this Chapter 11 Case. The Debtor continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On November 3, 2022, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed an Official Committee of Unsecured Creditors (the "Committee") [Docket No. 79]. No trustee or examiner has been appointed in the Chapter 11 Case.

4.      As more fully set forth in the First Day Declaration,[4] the Debtor commenced this Chapter 11 Case to avail itself of the protections and "breathing room" of the Chapter 11 process and to preserve its interest in the Bentracimab Development Program and pursue a value-maximizing sale transaction for the benefit of the Debtor's estate, creditors, and other stakeholders.

5.      To that end, the Debtor seeks an expeditious adjudication of this Motion, which will enable the Debtor to consummate a sale of the Acquired Assets to the Stalking Horse Bidder (defined below) or to a Successful Bidder (as defined below) submitting a higher or otherwise best offer for these assets, and, separately, to consummate a sale of the Non-Bentracimab Assets, ensure

---

[4]     Additional factual background and information regarding the Debtor, including its business operations, its corporate and capital structure, and the events leading to the commencement of this Chapter 11 Case, are set forth in detail in the Frist Day Declaration, which is incorporated by reference herein.

4

277262451

that the Debtor's work developing life-saving drug therapies ultimately reaches and benefits millions of patients around the globe.

### A.    The Debtor's Product Portfolio and Related Assets

6.    The Debtor's business strategy is to identify, develop and commercialize novel therapies for cardiovascular diseases.  Its portfolio of products includes a number of clinical and pre-clinical candidates that are currently in varying stages of development, none of which has received regulatory approval to date.

### 1.    Bentracimab

7.    The Debtor has been pursuing development of its lead product candidate, bentracimab (also known as PB2452), since November 2017.  Bentracimab is a novel reversal agent for the antiplatelet drug ticagrelor.  Ticagrelor is marketed and sold by AstraZeneca under the brand name "Brilinta," and is widely prescribed to reduce the rates of death, heart attack and stroke in patients with acute coronary syndrome, or who have previously experienced a heart attack.  Due to ticagrelor's antiplatelet activity, patients on ticagrelor have an elevated risk of spontaneous bleeding.  In addition, patients on ticagrelor who need urgent surgery cannot wait the recommended five days for ticagrelor's effect to dissipate and are at increased risk of major bleeding during and after surgery.  There are currently no other known reversal agents approved or in clinical development for ticagrelor or any other antiplatelet drugs.  Upon approval, bentracimab would be the only therapeutic agent available for specific reversal of ticagrelor.  The availability of bentracimab as a specific reversal agent could expand ticagrelor's use by mitigating concerns regarding bleeding risk and uniquely position ticagrelor as the only oral antiplatelet drug with a reversal agent.

277262451

8.      Based on feedback from the U.S. Food and Drug Administration ("**FDA**"), the Debtor intends to seek approval of bentracimab in the United States through an accelerated approval process to treat patients who present with uncontrolled bleeding or require surgery.  The Debtor is currently targeting submission of a biologics license application to the FDA for bentracimab in mid-2023.

9.      Pursuant to this Motion, and as more fully set forth herein, the Debtor seeks authority to market and sell substantially all of its bentracimab-related assets—*i.e.*, the Acquired Assets—to the Stalking Horse Bidder (defined below) or to a winning bidder submitting a higher or otherwise best offer at the Auction for the Acquired Assets.

### a)      The SFJ Co-Development Agreement

10.     On January 9, 2020, the Debtor entered into a Co-Development Agreement (the "**CDA**") with SFJ Pharmaceuticals X, Ltd. ("**SFJ**") to obtain the investment funds needed to support the global development of bentracimab.  Pursuant to the CDA, SFJ agreed to provide up to a $120 million investment, comprised of (a) $90 million in initial funding, and (b) up to $30 million in additional funding.  The Debtor was eligible and elected to receive the full $30 million in additional funding on December 15, 2021, having met certain clinical development milestones, and SFJ has invested approximately $11.3 million of that amount to date.  Accordingly, as of the Petition Date, SFJ has invested a total of approximately $101.3 million with the Debtor pursuant to the CDA.

11.     Additionally, the CDA provides that SFJ will receive highly lucrative, return-on-investment payments of up to $600 million, but if and only if the Debtor receives future regulatory approvals for bentracimab by the U.S. Food and Drug Administration, the European Medicines Agency, and certain regulatory agencies in Asia (collectively, the "**Contingent Return-On-**

**Investment Payments**").   To date, none of these regulatory approvals have been received anywhere in the world, and the Debtor owes nothing to SFJ under the CDA.

12.      In an attempt to secure the Contingent Return-On-Investment Payments, the CDA purports to grant SFJ a security interest in all of the Debtor's assets.  This purported security interest covers all assets of the Debtor necessary for the manufacture, use, or sale of bentracimab, as well as all intellectual property and other assets related to the Debtor's clinical development programs for unrelated products.[5]

13.      On October 31, 2022, the Debtor filed its *Complaint for Recharacterization and Declaratory Relief* (the "**Adversary Complaint**")[6] to expeditiously resolve an ongoing dispute with SFJ regarding the Debtor's bentracimab-related assets.  The Adversary Complaint seeks a determination by the Court that (a) SFJ's investment with the Debtor under the CDA constitutes an equity contribution; (b) the security interest purporting to secure the Debtor's obligations under the CDA, including to pay the Contingent Return-On-Investment Payments on SFJ's equity contributions, is invalid; and that (c) the clinical trial and related data associated with its bentracimab drug program (the "**Trial Data Package**") is property of the Debtor's estate.  *See, e.g.*, Adversary Complaint ¶ 83.

### 2.    The Debtor's Non-Bentracimab Assets

14.      In addition to its bentracimab drug program and related assets (*i.e.*, the Acquired Assets), the Debtor's assets include other products, drug candidates, technology, and related assets (*i.e.*, the Non-Bentracimab Assets).

---

[5]    Under the subordination agreement between the Debtor's senior secured lender and SFJ, SFJ's purported security interest and ability to ultimately receive the Contingent Return-On-Investment Payments are subordinated to the Debtor's senior secured debt.

[6]    Adv. Proc. No. 22-50456 (LSS) (the "**Adversary Proceeding**"), Docket No. 1.

277262451

a)    **PB6440**

15.    The Debtor's development pipeline also includes PB6440, which the Debtor acquired from Viamet Pharmaceuticals Holdings, LLC and its wholly owned subsidiary, Selenity Therapeutics (Bermuda), Ltd., in January 2020.  PB6440 is a highly selective aldosterone synthase inhibitor being developed for treatment-resistant hypertension.  The Debtor initiated IND-enabling studies for PB6440 in 2021 and plans to submit an IND in 2023.  The Debtor is also targeting beginning a first-in-human trial for PB6440 in 2023.

b)    **ELP Technology**

16.    The Debtor has also developed proprietary technology based on recombinant biopolymers referred to as elastin-like polypeptides ("**ELPs**"), which significantly improve the stability of peptides and proteins and enable use of natural or minimally altered peptide sequences. This technology allows for long-term liquid stability, which is important for injectable products, and also enables product formulations that release over time after they are administered.

17.    The Debtor is working to apply its ELP technology to the development of novel product candidates, with a focus on peptides and proteins that are scientifically or clinically validated but where a suboptimal half-life, stability and delivery limit their potential therapeutic applications.  Its more advanced ELP pre-clinical programs include: (a) Glucagon-like peptide-2, or GLP-2, which is a potential treatment for patients with short bowel syndrome, Crohn's disease or mucositis in patients undergoing cancer treatment; and (b) C-type natriuretic peptide, which is a regulator of bone growth and can rescue defects that cause achondroplasia resulting in dwarfism.

B.    **The Debtor's Pre-Petition Marketing Process**

18.    As described in greater detail in the First Day Declaration, the Debtor spent significant time and effort to address its need for additional capital to support the development and

commercialization of its biopharmaceutical products prior to the Petition Date, including through the formation of the Strategic Transaction Committee and retentions of Cowen, and later, Miller Buckfire, which engaged in discussions with strategic parties regarding, among other things, the opportunity to acquire the Debtor. However, those efforts were not successful, principally, due to the significant overhang of the Contingent Return-On-Investment Payments required under the CDA; SFJ's refusal to engage with strategic partners identified by Cowen and Miller Buckfire; as well as SFJ's refusal to waive, modify, or renegotiate certain provisions of the CDA that would render the SFJ arrangement economically viable for the Debtor.

19.    On October 3, 2022, the Debtor obtained financing from JMB, which allowed the Debtor to avoid a potential default with its previous pre-petition lender, finalize preparations for its chapter 11 filing, and enable it to conduct a competitive process for a stalking horse bidder. With assistance from Miller Buckfire and other advisors, the Debtor engaged in accelerated discussions with the two strategic parties who expressed interest in serving as a stalking horse bidder for the bentracimab program and related assets. Those parties had conducted extensive diligence during the earlier marketing process and represented that they would be able to submit stalking horse proposals on an expedited timeframe. The parties had previously executed non-disclosure agreements and had access to the Debtor's virtual data room and other marketing materials. The parties and their advisors engaged in multiple rounds of negotiations and diligence with the Debtor and its advisors on an expedited basis.

20.    On October 13, 2022, the Debtor received a Non-Binding Proposal (the "**Stalking Horse Bid**") for the Acquired Assets from Chiesi Farmaceutici S.p.A ("**Chiesi**," or the "**Stalking Horse Bidder**") a large, well-capitalized pharmaceutical company. The other interested party was invited to submit a stalking horse proposal but declined to do so at that time.

21.     The Debtor and its advisors proceeded to engage in further negotiations with Chiesi regarding the terms of the Stalking Horse Bid, which was ultimately executed by the Debtor on October 17, 2022.  Following extensive, good faith and arm's length negotiations between the Debtor and its advisors on the one hand and Chiesi's advisors on the other, the Debtor determined that (i) the Stalking Horse Bid confers substantial value and benefit to the Debtor's estate, (ii) entry into the Stalking Horse APA, subject to higher and better offers, is the sound exercise of the Debtor's reasonable judgment, and (iii) filing this Motion with the Stalking Horse APA in hand, subject to the post-petition marketing process described herein, is in the Debtor's best interests to maximize the value of the Acquired Assets by setting an initial price "floor" in the sale process and moving that process forward in a timely manner given the Debtor's lack of liquidity.

## THE STALKING HORSE APA AND PROPOSED SALE ORDER

22.     On November 4, 2022, the parties executed the Stalking Horse APA, which, subject to this Court's approval, outlines the terms by which Chiesi will be designated the Stalking Horse Bidder.  Under the terms of the Stalking Horse APA, the Stalking Horse Bidder proposes to acquire the Acquired Assets for (i) cash of $40 million (the "**Upfront Payment**"); (ii) additional cash of up to $30 million upon achievement of FDA "Accelerated Approval" of bentracimab subject to potential offsets; (iii) cash of up to $30 million upon achievement of FDA "Full Approval" of bentracimab subject to potential offsets, provided that if Accelerated Approval is not previously achieved, it shall be deemed to be achieved immediately upon achievement of the "Full Approval", in each case, subject to potential offsets; (iv) satisfaction of cure amounts in connection with the assumption and assignment of designated executory contracts and leases[7]; (v) assumption

---

[7]    The Upfront Payment will be reduced dollar-for-dollar to the extent that the Stalking Horse Bidder's satisfaction of cure amounts in connection with the assumption and assignment of designated executory contracts and leases exceeds a specified cure costs cap.

277262451

of agreed-upon liabilities; and (vi) entry into a transition services agreement (collectively, the "**Purchase Price**").

23.    The Stalking Horse APA includes various representations, warranties and covenants by and from the Debtor and the Stalking Horse Bidder.  The Stalking Horse APA also includes provisions for the Break-Up Fee and Expense Reimbursement and other Stalking Horse Bid Protections (as defined and detailed below), certain conditions to the closing of the contemplated Sale, and customary termination rights.  The Stalking Horse Bid is additionally subject to, among other things, the transfer of the Acquired Assets free and clear of all liens, claims and encumbrances.

24.    In accordance with Local Rule 6004-1(b)(iv), the below chart summarizes certain significant terms of the Stalking Horse APA and proposed Sale Order.

| MATERIAL TERMS OF THE STALKING HORSE APA AND SALE ORDER[8] | | |
|---|---|---|
| **Term / Rule** | **Description** | **Citation** |
| **Sale to Insider** Local Rule 6004-1(b)(iv)(A) | The Stalking Horse Bidder is not an "insider", as that term is defined in section 101(31) of the Bankruptcy Code. | N/A |

---

[8] This summary is qualified in its entirety by the provisions of the Stalking Horse APA.  To the extent that there is any inconsistency between the terms of the Stalking Horse APA and this summary, the terms of the Stalking Horse APA shall control.  Capitalized terms used in this summary table but not otherwise defined in this Motion or the First Day Declaration have the meanings given to them in the Stalking Horse APA.

| | | |
|---|---|---|
| **Agreements with Management** Local Rule 6004-1(b)(iv)(B) | The Stalking Horse Bidder is not obligated to hire any Business Employee or any other employee of the Debtor, but shall have the right to offer employment or a consulting or independent contractor engagement to any Business Employee. The Stalking Horse Bidder (i) shall provide an offer of employment or engagement as a consultant or independent contractor to the Business Employees which constitute the required members of the Key Employee Group, as set forth in the Key Employee Notice and (ii) may provide an offer of employment or engagement as a consultant or independent contractor to other Business Employees (the employees identified to the Debtor by the Stalking Horse Bidder to receive such offers, the "**Offer Employees**"), such offer to be made no more than three (3) Business Days following the Auction. Each offer of employment or engagement shall provide that employment or engagement with Purchaser shall commence effective as of the Closing, subject to the Offer Employee's continued employment with Debtor through the Closing and conditioned upon the Closing. | Stalking Horse APA § 5.12 |
| **Releases** Local Rule 6004-1(b)(iv)(C) | None. | N/A |
| **Break-Up Fee and Expense Reimbursement** Local Rule 6004-1(c)(i)(C)(2) | As inducement for entering into the Stalking Horse APA, with respect to the Acquired Assets, the Stalking Horse Bidder shall be entitled to the following bid protections (collectively, the "**Stalking Horse Bid Protections**"): (a) a breakup fee in the amount of $2,000,000 (the "**Break-Up Fee**")[9]; (b) expense reimbursement of up to $750,000 (the "**Expense Reimbursement**"), (c) an initial overbid increment of $1,000,000 ("**Initial Overbid**"); (d) treatment of the Break-Up Fee and Expense Reimbursement as a superpriority claim senior to all other administrative expenses, subject only to the superpriority claims granted in favor of the DIP Lender in an amount not to exceed the amount of the DIP Loan Commitment (as defined in the interim order authorizing the Debtor to obtain postpetition financing and related relief [Docket No. 57] and in any final order thereon); and (e) the right, but not the obligation to serve as a Backup Bidder (defined below) at the conclusion of the Auction for the Acquired Assets. The Break-Up Fee and Expense Reimbursement will be payable only upon the consummation of an Alternative Transaction (as defined in the Stalking Horse APA). | Stalking Horse APA § 8.2(b), at 66. |
| **Private Sale / No Competitive Bidding** Local Rule 6004-1(b)(iv)(D) | If the Debtor receives a Qualified Bid (other than the Stalking Horse Bid) with respect to the Acquired Assets, the Debtor shall conduct the Auction to determine the Successful Bidder with respect to the Acquired Assets. If the Debtor does not receive a Qualified Bid (other than the Stalking Horse Bid) with respect to | Bidding Procedures § VII. |

---

[9]    The Break-Up Fee represents 2% of the total cash amount of the Purchase Price and 5% of the $40 million Upfront Payment.

| | | |
|---|---|---|
| | the Acquired Assets, the Debtor will not conduct the Auction with respect to the Acquired Assets and will designate the Stalking Horse Bidder's Qualified Bid as the Successful Bid. | |
| **Closing and Other Deadlines** Local Rule 6004-1(b)(iv)(E) | The Stalking Horse APA contains customary conditions precedent to closing, including entry of the Sale Order, any necessary governmental approvals, delivery of ancillary agreements required to accomplish the Sale, including the Transition Services Agreement, the Intellectual Property Assignment Agreements, and the Bill of Sale & Assignment and Assumption Agreement, and no Material Adverse Effect has occurred prior to the Closing Date. The Closing will occur within two (2) Business Days following the satisfaction or waiver of the closing conditions, or another day as agreed between the Debtor and Stalking Horse Bidder. | Stalking Horse APA §§ 2.2, 6.2 |
| **Good Faith Deposit** Local Rule 6004-1(b)(iv)(F) | Within three (3) Business Days following the execution of the Stalking Horse APA, the Stalking Horse Bidder shall deposit into escrow with the Escrow Agent in an amount equal to $4,000,000 (the "**Deposit Funds**"), by wire transfer of immediately available funds pursuant to the terms of the Escrow Agreement. The Deposit Funds shall be released by the Escrow Agent and delivered to either (x) the Stalking Horse Bidder or (y) the Debtor, as follows: <br><br>• If the Closing occurs, the Deposit Funds will be applied towards the portion of the Purchase Price payable by the Stalking Horse Bidder to the Debtor and in such case, the Deposit Funds shall be released to the Debtor within three (3) Business Days following the Closing; <br><br>• If the Stalking Horse APA is terminated by the Debtor (A) pursuant to Section 8.1(b)(iii) or (B) pursuant to **Error! Reference source not found.** in any circumstance where the Stalking Horse Bidder is not entitled to terminate pursuant to Section 8.1(a) because the failure of the Closing to occur results from the material breach by the Stalking Horse Bidder of its obligations under Section 5.3 required to be performed by it at or prior to the Closing, in each case unless at the time of such termination the Stalking Horse Bidder would have been entitled to terminate the Stalking Horse APA, then the Deposit Funds shall be released to the Debtor within five (5) Business Days following such termination; or <br><br>• If the Stalking Horse APA is terminated other than in a manner provided by Section 1.6(b)(ii), the Deposit Funds shall be released to the Stalking Horse Bidder within five (5) Business Days after such termination. | Stalking Horse APA § 1.6(b) |

13

| | | |
|---|---|---|
| **Interim Arrangements with Stalking Horse Bidder** Local Rule 6004-1(b)(iv)(G) | There are no agreements for interim management or similar arrangements.  However:<br><br>• Under Section 5.1, the Debtor agrees to conduct its business related to the Acquired Assets in the ordinary course of its business, consistent with past practices, prior to the Closing.<br><br>• Under Section 5.2, the Debtor agrees to provide the Stalking Horse Bidder with reasonable access to, among other things, its books and records. | Stalking Horse APA §§ 5.1, 5.2 |
| **Use of Proceeds** Local Rule 6004-1(b)(iv)(H) | The Debtor does not propose to release any sale proceeds without further Court order. | N/A |
| **Tax Exemption** Local Rule 6004-1(b)(iv)(I) | The Stalking Horse APA does not seek to have the Sale declared exempt from taxes under section 1146(a) of the Bankruptcy Code.  However, the Sale Order will provide either that the Debtor has complied with any applicable bulk sale or bulk transfer laws of any jurisdiction in connection with the Transactions or compliance with such laws is not necessary or appropriate under the circumstances. | Stalking Horse APA § 9.2 |
| **Record Retention** Local Rule 6004-1(b)(iv)(J) | The Stalking Horse Bidder agrees to preserve all records in its possession from and after the Closing for a period of three (3) years following the Closing Date, and will provide reasonable access to the Debtor and its advisors at no charge during normal business hours. | Stalking Horse APA § 5.2(b) |
| **Sale of Avoidance Actions** Local Rule 6004-1(b)(iv)(K) | The Acquired Assets include all avoidance claims or causes of action available to Debtor under Chapter 5 of the Bankruptcy Code (including Sections 544, 545, 547, 548, 549, 550 and 553) or any similar actions under any other applicable law (collectively, **"Avoidance Actions"**) against certain designated parties set forth on Schedule 1.1(n) of the Stalking Horse APA (collectively, the **"Designated Parties"**)[10]; *provided*, *however*, that it is understood and agreed by the parties that the Stalking Horse Bidder will not pursue or cause to be pursued any such Avoidance Actions. | Stalking Horse APA § 1.1(m) |
| **Requested Findings as to Successor Liability** Local Rule 6004-1(b)(iv)(L) | Under the Stalking Horse APA, the Stalking Horse Bidder is only assuming those liabilities identified in Section 1.3.<br><br>The Debtor is seeking to sell the Acquired Assets free and clear of successor liability claims.  The Debtor will have material unpaid prepetition unsecured claims after the closing of the Sale. | Stalking Horse APA § 1.3 |

---

[10]    SFJ is expressly excluded from the list of the Designated Parties.

| Sale Free and Clear of Unexpired Leases Local Rule 6004-1(b)(iv)(M) | The Stalking Horse APA provides that the Acquired Assets will be sold free and clear of all Encumbrances of any and every kind, nature and description, other than Permitted Post-Closing Encumbrances. | Stalking Horse APA § 1.1 |
|---|---|---|
| Credit Bid Local Rule 6004-1(b)(iv)(N) | The Stalking Horse Bidder holds no secured debt of the Debtor.<br><br>The DIP Lender is authorized to submit a credit bid for the purchase of all of the collateral on which such DIP Lender holds a valid, perfected, and unavoidable lien up to the amount of the outstanding balance under the DIP Facility.  No party shall be permitted or entitled to credit bid, or attempt to credit bid, any obligation that may constitute a contingent, unliquidated, or disputed claim against the Debtor.  Neither SFJ Pharmaceuticals X, Ltd. nor any of its affiliates would have the right to credit bid. | Bidding Procedures § VI |

## THE PROPOSED BIDDING PROCEDURES

25.     In addition to the discussions with strategic parties prepetition, Miller Buckfire[11] has received and responded to a number of inquiries subsequent to the filing of this Chapter 11 Case from parties expressing interest in the Acquired Assets and the Non-Bentracimab Assets and participating in a sale process.  In connection with the filing of the Bidding Procedures, Miller Buckfire has launched a robust postpetition marketing process, which will include the parties contacted in the earlier prepetition process and additional potential interested parties, including SFJ.

26.     The Debtor, with the assistance of its advisors, will continue marketing the Debtor's Acquired Assets and the Non-Bentracimab Assets to potential buyers and facilitate access to marketing materials that will include details of the proposed Bidding Procedures and Stalking Horse Bid (in connection with marketing the Acquired Assets), a form asset purchase agreement and sale order (in connection with the Non-Bentracimab Assets), a non-confidential presentation and, for those executing a non-disclosure agreement, access to a virtual data room, confidential

---

[11]    In connection with the Debtor's prepetition and postpetition sale efforts, Stifel's Healthcare investment banking team has led the combined efforts of professionals from Stifel and Miller Buckfire.

277262451

presentation materials and, as appropriate, meetings with management.

27.     To facilitate the Sale and the Additional Sale, the Debtor has proposed certain bidding procedures (the "**Bidding Procedures**") designed to promote a competitive, fair, and expedient sale process and generate the greatest level of interest in the Acquired Assets and the Non-Bentracimab Assets, and to obtain the highest or otherwise best value for the Acquired Assets and the Non-Bentracimab Assets for the benefit of the Debtor's estate and its stakeholders.  The Bid Deadline provides approximately seven (7) weeks after the Petition Date for interested parties to obtain information, formulate and submit a competing bid to purchase some or all of the Debtor's assets.  The marketing period is substantially longer for the parties who participated in the prepetition process or knew of the Debtor's financial condition before the Debtor's chapter 11 filing.  Among other things, the Bidding Procedures, in the Debtor's business judgment, create an appropriate timeline for the sale process, in light of the Adversary Proceeding and the Debtor's liquidity constraints.

28.     The Debtor is requesting approval of the Bidding Procedures, which describe, among other things, (i) the Acquired Assets, and separately, the Non-Bentracimab Assets available for separate sales, (ii) the manner in which bids (each a "**Bid**" and collectively, "**Bids**") become "qualified," (iii) the coordination of diligence efforts between the bidders and the Debtor, (iv) the receipt and negotiation of bids received, (v) the conduct of any Auction, (vi) the selection and approval of the Successful Bidder and the selection of the Backup Bidder, and (vii) certain Stalking Horse Bid Protections for the Stalking Horse Bidder with respect to the Acquired Assets.  The Bidding Procedures reflect the Debtor's objective of conducting the sale process in a controlled, but fair and open, manner while ensuring that the highest or best bid is generated for the Acquired Assets, and separately for the Non-Bentracimab Assets.

29.    In accordance with Local Rule 6004-1(c)(i), the below chart summarizes certain significant terms of the Bidding Procedures and Bidding Procedures Order.

| MATERIAL TERMS OF THE BIDDING PROCEDURES AND BIDDING PROCEDURES ORDER[12] | |
|---|---|
| **Term / Rule** | **Description** |
| **Qualification of Bidders** Local Rule 6004-1(c)(i)(A) | To participate in the bidding process, a person or entity interested in the Acquired Assets, or separately in the Non-Bentracimab Assets (other than the Stalking Horse Bidder) (a "**Potential Bidder**") must deliver to Miller Buckfire the following documents and information (collectively, the "**Preliminary Bid Documents**"), unless previously provided to the Debtor's satisfaction: <br><br> • An executed confidentiality and nondisclosure agreement on terms acceptable to the Debtor (a "**Confidentiality Agreement**"); and <br><br> • proof by the Potential Bidder of its financial capacity to close a proposed Sale Transaction(s) in an amount not less than the Minimum Qualified Bid, which may include, but is not limited to, audited financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Acquired Assets, or separately the Non-Bentracimab Assets, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtor and its advisors. *See* Bidding Procedures § II.A. <br><br> The Debtor, in consultation with the Consultation Parties[13] and their respective advisors, will determine and notify each Potential Bidder whether such Potential Bidder has submitted adequate Preliminary Bid Documents so that such Potential Bidder may submit a Bid (each, an "**Acceptable Bidder**", and each such bid, an "**Acceptable Bid**").  The Stalking Horse Bidder shall be deemed an Acceptable Bidder, and the Stalking Horse Bid shall be deemed an Acceptable Bid.  *See* Bidding Procedures § II.B. |
| **Qualified Bids** Local Rule 6004-1(c)(i)(B) | **Bid Deadline: December 9, 2022 at 5:00 p.m. (prevailing Eastern Time)** (the "**Bid Deadline**"). <br><br> Any binding proposal, solicitation, or offer (each, a "**Bid**") will be considered a qualified bid only if the Bid is submitted in writing by an Acceptable Bidder, by the Bid Deadline, and is deemed to comply with all of the following in the Debtor's |

---

[12]    This summary is qualified in its entirety by the provisions of the Bidding Procedures and Bidding Procedures Order.  To the extent that there is any inconsistency between the terms of the Bidding Procedures and/or Bidding Procedures Order (as applicable) and this summary, the terms of the Bidding Procedures and/or Bidding Procedures Order (as applicable) shall control.  Capitalized terms used in this summary table but not otherwise defined in this Motion or the First Day Declaration have the meanings given to them in the Bidding Procedures and/or Bidding Procedures Order (as applicable).

[13]    The "Consultation Parties" are the DIP Lender and the Committee.

business judgment (in consultation with the Consultation Parties) (a "**Qualified Bid**" and such bidder a "**Qualified Bidder**"):

- *Purpose*. Each Qualified Bidder must state that the Bid includes an irrevocable and binding offer by the Qualified Bidder to purchase the Acquired Assets, or separately the Non-Bentracimab Assets (identified with specificity) and specify the Debtor's liabilities that the Qualified Bidder seeks to assume.

- *Assets and Liabilities*. The Bid must clearly identify the following: (a) the Acquired Assets to be purchased, or separately the Non-Bentracimab Assets to be purchased; (b) the liabilities and obligations to be assumed, including any indebtedness to be assumed, if any; and (c) any transition services agreement and consideration thereunder, if any.

- *Purchase Price*. The Bid must clearly set forth the cash Purchase Price, whether such Purchase Price includes a combination of cash payments at closing and subsequent or contingent cash payments, and any other non-cash consideration (with the form of such consideration specified), to be paid. If a bid includes forms of consideration other than cash, the bidder shall include an analysis of description of the value of such non-cash components, including any supporting documentation, to assist the Debtor and the Consultation Parties.

- *Minimum Qualified Bid for the Acquired Assets*.  With respect to the Acquired Assets, in order to be considered a Qualified Bid, the Acceptable Bidder must submit a bid that does not include a credit bid by the holder of a lien on the Acquired Assets (other than a credit bid by the DIP Lender, on the terms described in Section VI of the Bidding Procedures), is not a plan of reorganization, and provides consideration of at least: (i) the Purchase Price provided for in the Stalking Horse APA, plus (ii) the Breakup fee and the Expense Reimbursement (with such amounts to be paid in cash), plus (iii) the initial bid increment of $1 million in cash (a "**Minimum Qualified Bid**").

- *Deposit*. Each Bid for the Acquired Assets must be accompanied by a good faith deposit in the form of cash in an amount equal to not less than ten percent (10%) of the amount of the Upfront Payment, to be held in an escrow account to be identified and established by the Debtor (the "**Deposit**"). Each Bid for the Non-Bentracimab Assets must be accompanied by a good faith deposit in the form of cash in an amount equal to not less than ten percent (10%) of the amount of the proposed purchase price, to be held in an escrow account to be identified and established by the Debtor (the "**Non-Bentracimab Deposit**") provided further, DIP Lender shall not be required to deliver a Deposit in connection with any credit bid submitted.

- *Marked Agreement for Acquired Assets.* Each Bid must include duly executed, non-contingent transaction documents necessary to close the transactions contemplated in the Bid (the "**Bid Documents**"). The Bid Documents shall include (i) a schedule of Assigned Contracts (as defined in the Stalking Horse APA) to the extent applicable to the Bid; a proposed asset purchase agreement (each, a "**Purchase Agreement**") and a clearly marked

277262451

version of the Stalking Horse APA and the Sale Order showing all changes requested by the Acceptable Bidder, as well as all other material documents integral to such Bid.

- *Marked Agreement for Non-Bentracimab Assets*. Each Bid for the Non-Bentracimab Assets must include duly executed, non-contingent transaction documents necessary to close the transactions contemplated in the Bid (the "**Bid Documents**"). The **Bid Documents** shall include (i) a schedule of Separate Assigned Contracts to the extent applicable to the Bid; a proposed asset purchase agreement (each, a "**Purchase Agreement**") and a clearly marked version of any form of APA and form of Additional Sale Order provided by the Debtor showing all changes requested by the Acceptable Bidder, as well as all other material documents integral to such Bid.

- *Committed Financing*. To the extent that a Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the proposed transactions set forth in its Bid with cash on hand, each Bid must include committed financing documented to the satisfaction of the Debtor (in consultation with the Consultation Parties) that demonstrates that the Acceptable Bidder has received sufficient unconditional debt and/or equity funding commitments to satisfy the Acceptable Bidder's Purchase Price and other obligations under its Bid, including providing adequate assurance of future performance under all contracts proposed to be Assigned Contracts or Separate Assigned Contracts by such Bid and providing adequate assurance of future performance of any future or deferred or contingent payment amounts included in its Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtor (in consultation with the Consultation Parties).

- *Contingencies; No Financing or Diligence Outs*. A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence.

- *Identity*. The Bid must fully disclose the identity of the Acceptable Bidder and provide the contact information of the specific person(s) whom the Debtor or its advisors should contact (including any equity holder or other financial backer if the Acceptable Bidder is an entity formed for the purpose of consummating the proposed Sale) in the event that the Debtor has any questions or wishes to discuss the Bid.

- *Irrevocable*. An Acceptable Bidder's Bid must be irrevocable, unconditional, and binding until no earlier than two (2) business days after the closing of the Sale or the Additional Sale, as applicable, and such longer period as is applicable if such Acceptable Bidder's Bid is selected as the Backup Bid for the Acquired Assets or separately for the Non-Bentracimab Assets.

- *Backup Bidder*. With respect to the Acquired Assets, other than the Stalking Horse Bid, each Bid must contain an agreement for the Acceptable Bidder to

277262451

be a Backup Bidder if such bidder's Qualified Bid is selected as the next highest or next best bid after the Successful Bid. With respect to the Non-Bentracimab Assets, each Bid must contain an agreement for the Acceptable Bidder to be a Backup Bidder if such bidder's Qualified Bid is selected as the next highest or next best bid after the Successful Bid.

- *As-Is, Where-Is*. The Bid must include the following representations and warranties: (a) expressly state that the Acceptable Bidder has had an opportunity to conduct any and all due diligence regarding the Debtor's businesses and the Acquired Assets, or the Non-Bentracimab Assets, as applicable, prior to submitting its bid; and (b) a statement that the Acceptable Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Acquired Assets, or the Non-Bentracimab Assets, as applicable, in making its Bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtor's business or the Acquired Assets, or the Non-Bentracimab Assets, as applicable, or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Acceptable Bidder's proposed asset sale agreement ultimately accepted and executed by the Debtor.

- *Authorization*. The Bid must include evidence that the Acceptable Bidder has obtained authorization or approval from its board of directors (or comparable governing body) acceptable to the Debtor with respect to the submission, execution, and delivery of its Bid and Bid Documents, participation in the Auction, and closing of the proposed transaction(s) contemplated in such Bid. The Bid shall further state that any necessary filings under applicable regulatory, antitrust, and other laws will be made in a timely manner and that payment of the fees associated therewith shall be made by the Acceptable Bidder.

- *Disclaimer of Fees*. Each Bid (other than the Stalking Horse Bid) must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, "topping" or termination fee, or any other similar form of compensation. For the avoidance of doubt, no Qualified Bidder (other than the Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtor, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

- *Time Frame for Closing*. A Bid by an Acceptable Bidder must be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations in the Debtor's business judgment) to be consummated, if selected as the Successful Bid, within a time frame reasonably acceptable to the Debtor (in consultation with the Consultation Parties). The Acceptable Bidder must commit to closing the proposed Sale(s) contemplated by the Bid

as soon as practicable and provide perspective on any potential regulatory issues that may arise in connection with such Acceptable Bidder's acquisition of the Acquired Assets including timing for resolution thereof; *provided* that the closing of the transaction shall not be later than January 31, 2023.

- *Adherence to Bidding Procedures*.  Each Bid must include (a) a statement that the Acceptable Bidder has acted in good faith consistent with section 363(m) of the Bankruptcy Code and agrees to be bound by these Bidding Procedures; and (b) that the Bid constitutes a *bona fide* offer to consummate the proposed transactions.

- *Cooperation*. The Acceptable Bidder must provide a covenant to cooperate with the Debtor to provide pertinent factual information regarding such bidder's operations reasonably required to analyze issues arising with respect to any applicable laws or regulatory requirements.

- *No Collusion*. The Acceptable Bidder must acknowledge in writing that (a) in connection with submitting its Bid, it has not engaged in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids or the Sale, specifying that it did not agree with any Potential Bidders, Acceptable Bidders or Qualified Bidders to control price; and (b) it agrees not to engage in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids, the Auction, or the Sale or the Additional Sale, as applicable.

- *Other Information*. The Bid contains such other information as may be reasonably requested by the Debtor and the Consultation Parties with such requests made through the Debtor.

*See* Bidding Procedures § III.

If the Debtor receives a Qualified Bid (other than the Stalking Horse Bid) with respect to the Acquired Assets, the Debtor shall conduct the Auction to determine the Successful Bidder with respect to the Acquired Assets. If the Debtor does not receive a Qualified Bid (other than the Stalking Horse Bid) with respect to the Acquired Assets, the Debtor will not conduct the Auction with respect to the Acquired Assets and will designate the Stalking Horse Bidder's Qualified Bid as the Successful Bid. Subject to the Debtor's reasonable business judgment (in consultation with the Consultation Parties), the Debtor will conduct the Auction with respect to the Non-Bentracimab Assets. *See* Bidding Procedures § VII.

No later than twenty-four (24) hours prior to the commencement of the Auction, the Debtor will notify all Qualified Bidders of the highest or otherwise best Qualified Bid, as determined in the Debtor's reasonable business judgment (in consultation with the Consultation Parties) (the "**Baseline Bid**"), with respect to the Acquired Assets, and separately with respect to the Non-Bentracimab Assets, and provide copies of the Bid Documents supporting the Baseline Bid to the Stalking Horse Bidder and all other Qualified Bidders with respect to the Sale and the Additional Sale. *See* Bidding Procedures § VII.

277262451

|  | The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtor (in consultation with the Consultation Parties) reasonably deems relevant to the value of the Qualified Bid to the Debtor's estate, including, with respect to the Acquired Assets, among other things: (a) the number, type, and nature of any changes to the Stalking Horse APA requested by the Qualified Bidder, the Cure Amounts to be paid, and the Assumed Liabilities to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the bidder's ability to close the proposed Sale Transaction(s), the conditions thereto, and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtor's estate from the transactions contemplated by the Bid Documents; (e) the likelihood that the Qualified Bidder and the Successful Bidder has the ability, resources, and personnel to ensure that the Acquired Assets will be approved by relevant regulators and commercialized for better health outcomes for patients worldwide; (f) the continued employment of the Debtor's current employees; (g) the net benefit to the Estate and (h) the tax consequences of such Qualified Bid (collectively, the "**Bid Assessment Criteria**"). *See* Bidding Procedures § VII.<br><br>As to the Non-Bentracimab Assets, the determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtor (in consultation with the Consultation Parties) reasonably deems relevant to the value of the Qualified Bid to the Debtor's estate. *See* Bidding Procedures § VII. |
| **Credit Bidding**<br>Local Rule 6004-1(b)(iv)(N) | The Stalking Horse Bidder holds no secured debt of the Debtor.<br><br>The DIP Lender is authorized to submit a credit bid for the purchase of all of the collateral on which such DIP Lender holds a valid, perfected, and unavoidable lien up to the amount of the outstanding balance under the DIP Facility. No party shall be permitted or entitled to credit bid, or attempt to credit bid, any obligation that may constitute a contingent, unliquidated, or disputed claim against the Debtor. Neither SFJ Pharmaceuticals X, Ltd. nor any of its affiliates would have the right to credit bid. *See* Bidding Procedures § VI. |
| **Relief from Bankruptcy Rule 6004(h)**<br>Local Rule 6004-1(b)(iv)(O) | The Bidding Procedures Order seeks relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h). *See* Bidding Procedures Order ¶ 24. |
| **No-Shop or No-Solicitation Provisions**<br>Local Rule 6004-1(c)(i)(C)(1) | The Bidding Procedures Order and Bidding Procedures do not limit the Debtors' ability or right to solicit higher or otherwise better bids. The Sale and the Additional Sale contemplated by this Motion, the Bidding Procedures, and the Bidding Procedures Order calls for a fair and open bidding and auction process. |
| **Break-Up Fee and Expense Reimbursement**<br>Local Rule 6004-1(c)(i)(C)(2) | The proposed Bidding Procedures Order and Stalking Horse APA seek approval of the Break-Up Fee and Expense Reimbursement for the Stalking Horse Bidder. *See* Bidding Procedures Order ¶ 10.<br><br>No person or entity other than the Stalking Horse Bidder shall be entitled to any expense reimbursement, break-up fees, "topping," termination, or other similar fee or payment in connection with the purchase of the Acquired Assets or the Non- |

22

| | |
|---|---|
| | Bentracimab Assets, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this Court any request for expense reimbursement or any fee of any nature, whether by virtue of section 503(b) of the Bankruptcy Code or otherwise related to the purchase of the Acquired Assets or the Non-Bentracimab Assets. *See* Bidding Procedures Order ¶ 15. |
| **Initial Overbid and Bidding Increments** Local Rule 6004-1(c)(i)(C)(3) | With respect to the Acquired Assets, to facilitate an efficient bidding and auction process, the Bidding Procedures seek to establish an initial overbid increment of $1,000,000 for purposes of a Minimum Qualified Bid. *See* Bidding Procedures § III.4. Qualified Bidders may submit successive bids higher than the previous bid, based on and increased from the Baseline Bid for the Acquired Assets (each such bid, an "**Overbid**"). Any Qualified Bidder's initial Overbid shall be made in increments of at least $500,000 in cash, cash equivalents, or such other consideration that the Debtor deems equivalent (in consultation with the Consultation Parties). The Debtor may, in its reasonable business judgment (in consultation with the Consultation Parties), announce increases or reductions to initial or subsequent Overbids at any time during the Auction. *See* Bidding Procedures § VII.B.2. <br><br> With respect to the Non-Bentracimab Assets, the Debtor may, in its reasonable business judgment (in consultation with the Consultation Parties), announce any initial overbid amount or increases or reductions to initial or subsequent overbids at any time during the Auction. |
| **Treatment of Break-Up Fee and Expense Reimbursement at Auction** Local Rule 6004-1(c)(i)(C)(4) | The Break-Up Fee and Expense Reimbursement amounts are included in the consideration required to submit a Minimum Qualified Bid. *See* Bidding Procedures § III.4. |
| **Modification of Bidding and Auction Procedures** Local Rule 6004-1(c)(i)(D) | The Debtor may announce at the Auction additional procedures for conducting the Auction or modify these Bidding Procedures with, as to the Acquired Assets only, the consent of the Stalking Horse Bidder. All such modifications and additional rules will be communicated in advance to each of the Consultation Parties, Acceptable Bidders, and Qualified Bidders; *provided*, that, to the extent such modifications occur at the Auction, disclosure of such modifications shall be limited to those in attendance at the Auction. *See* Bidding Procedures § VII.B.6. |
| **Closing with Alternative Back-Up Bidders** Local Rule 6004-1(c)(i)(E) | The Qualified Bidder with the next-highest or otherwise second-best Qualified Bid as compared to the Successful Bid at the Auction for the Acquired Assets, as determined by the Debtor in the exercise of its reasonable business judgment (in consultation with the Consultation Parties) (the "**Backup Bid**"), shall be required to serve as a backup bidder (the "**Backup Bidder**"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated. In the case of the Stalking Horse Bidder, it may, but has no obligation to, serve as the Backup Bidder. The Qualified Bidder with the next-highest or otherwise second-best Qualified Bid as compared to the Successful Bid at the Auction for the Non-Bentracimab Assets, as determined by the Debtor in the exercise of its reasonable business judgment (in consultation with the Consultation Parties) (the "**Backup Bid**"), shall be required to serve as a backup bidder (the "**Backup** |

Bidder") for the Non-Bentracimab Assets, and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated.

The identity of the respective Backup Bidder and the amount and material terms of the Qualified Bid of such Backup Bidder shall be announced by the Debtor at the conclusion of the Auction at the same time the Debtor announces the identity of each respective Successful Bidder.

Backup Bids shall remain binding on the Backup Bidders until the earlier of (a) the closing of a Sale Transaction for the Acquired Assets pursuant to the Successful Bid, and separately the closing of a Sale Transaction for the Non-Bentracimab Assets pursuant to the Successful Bid for such assets and (b) twenty (20) days after the date of the Sale Hearing, unless otherwise agreed between the Debtor and the Backup Bidders. If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtor may select the respective Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes.

See Bidding Procedures § VIII.

## KEY SALE PROCESS DATES

30.    The following is a summary of the proposed key dates for the sale process:

| Date | Deadline/Event |
|---|---|
| November 21, 2022, at [_]:00 [p.m.] (prevailing Eastern Time) | Bidding Procedures Hearing |
| Three (3) business days after the entry of the Bidding Procedures Order | Deadline for Debtor to serve the Contract Assumption Notice ("**Assumption and Assignment Service Deadline**") |
| Fourteen (14) days before the Sale Hearing | Deadline for Debtor to file form of Additional Sale Order to be provided to Acceptable Bidders |
| December 7, 2022, at 4:00 p.m. (prevailing Eastern Time) | Deadline to object to the Sale [14] of the Acquired Assets or the Additional Sale of the Non-Bentracimab Assets<br><br>Deadline for contract counterparties to object to the Debtor's potential assumption and assignment to the Successful Bidder with respect to any Assigned Contract or Separate Assigned Contract (the "**Contract Objection Deadline**") |

---

[14]    This objection deadline applies to all objections to the Motion, the Sale of the Acquired Assets, and of the Additional Sale of the Non-Bentracimab Assets, to an applicable Successful Bidder, with the exception of objections related solely to conduct of the Auction, identity of the applicable Successful Bidder, and adequate assurance of future performance by the applicable Successful Bidder.

| December 9, 2022, at 5:00 p.m. (prevailing Eastern Time) | Bid Deadline |
|---|---|
| December 12, 2022, starting at 10:00 a.m. (prevailing Eastern Time) | Auction (if necessary) |
| 24 hours following closing of the Auction | Deadline to file and serve Notice of Successful Bidder |
| December 14, 2022, at 4:00 p.m. (prevailing Eastern Time) | Deadline to object to (i) conduct of the Auction, (ii) the proposed Sale to the Successful Bidder and the proposed Additional Sale to the Successful Bidder for the Non-Bentracimab Assets, and (iii) the ability of the Successful Bidder (and the Successful Bidder for the Non-Bentracimab Assets) to provide adequate assurance of future performance, or the proposed form of adequate assurance of future performance ("**Sale Objection Deadline**") |
| December 15, 2022, at [_]:00 [a.m./p.m.] (prevailing Eastern Time) | Sale Hearing |
| [__], 2022, at [_]:00 [a.m./p.m.] (prevailing Eastern Time) | Assumption/Assignment Hearing (if necessary) |
| On or prior to December 21, 2022 | Closing |

31.     The Debtor respectfully submits that the timeline set forth above is reasonable and necessary under the circumstances of the Chapter 11 Case.  This timeline provides an approximately five-week period between the filing of the Motion and the Bid Deadline.  This timeline, which will allow the Debtor to build off the marketing process conducted prepetition by Miller Buckfire will allow potential bidders sufficient time to formulate Bids for the Acquired Assets and for the Non-Bentracimab Assets.  In light of this prepetition marketing process, the Debtor believes that the most likely potential purchasers for the Acquired Assets and Non-Bentracimab Assets have already been contacted regarding the potential to purchase such assets. Moreover, relevant information regarding the Debtor's business has been made available in the Debtor's electronic data room, allowing potential bidders (subject to the execution of a

confidentiality agreement) to immediately conduct due diligence on the Acquired Assets and for the Non-Bentracimab Assets.  Additionally, the Debtor and its advisors began marketing the Acquired Assets and the Non-Bentracimab Assets prior to the filing of this Motion.

### NOTICE PROCEDURES FOR THE SALE, ADDITIONAL SALE, BIDDING PROCEDURES, AUCTION, AND SALE HEARING

32.     The Debtor also requests approval of the notice of the Bidding Procedures, Auction, the Sale, the Additional Sale, and the Sale Hearing (the "**Sale Hearing Notice**") substantially in the form attached to the Bidding Procedures Order as **Exhibit 2**.

33.     Within five (5) days following entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtor shall cause the Sale Hearing Notice to be served on the following parties or their respective counsel, if known: (a) the Notice Parties (as defined in the Bidding Procedures); (b) counsel to the Stalking Horse Bidder; (c) all parties to executory contracts and leases to be assumed and assigned, or rejected as part of the proposed Sale; (d) all parties who have expressed a written interest in the Acquired Assets or the Non-Bentracimab Assets; (e) all known holders of liens, encumbrances, and other claims secured by the Acquired Assets or the Non-Bentracimab Assets; (f) the Internal Revenue Service; (g) all applicable state and local taxing authorities; (h) the FDA and any other regulatory agencies located in relevant locations having jurisdiction and regulatory authority similar to FDA; (i) each governmental agency that is an interested party with respect to the Sale or the Additional Sale and transactions proposed thereunder; and (j) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.

34.     On or about the same date, the Debtor will publish the Sale Hearing Notice on the website of the Debtor claims and noticing agent and will also publish a notice substantially similar to the Sale Hearing Notice in the *The New York Times* (national edition).  The Sale Hearing Notice

will include, among other things, the date, time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested in the Motion once they are set by the Court.

**ASSUMPTION AND ASSIGNMENT PROCEDURES**

35.    To facilitate the Sale and the Additional Sale, the Debtor seeks authority to assume and assign to any Successful Bidder the Assigned Contracts and the Separately Assigned Contracts (as applicable) in accordance with the Assumption Procedures provided herein and the form and manner of notice thereof, substantially in the form of the Contract Assumption Notice attached to the Bidding Procedures Order as **Exhibit 4**.

36.    By no later than three (3) business days after the entry of the Bidding Procedures Order, the Debtor shall serve a notice of contract assumption (the "**Contract Assumption Notice**"), in substantially the form attached to the Bidding Procedures Order as **Exhibit 4**, via overnight delivery or email on all counterparties that are subject to the Contract Assumption Notice, and provide a copy of the same to the Stalking Horse Bidder.  The Contract Assumption Notice shall inform each recipient of: (i) the timing and procedures relating to such assumption and assignment, to the extent applicable, (ii) the title of the executory contract or lease, (iii) the name of the counterparty to the executory contract or lease, (iv) Debtor's good faith estimates of the Cure Amounts (if any) required in connection with the executory contract or lease, (v) the identity of the Stalking Horse Bidder (as assignee, if applicable, with respect to the Acquired Assets), and (vi) the Sale Objection Deadline; *provided*, *however*, that service of a Contract Assumption Notice does not constitute an admission that such contract is an executory contract or that such stated Cure Amount constitutes a claim against the Debtor or a right against the Stalking Horse Bidder (or other Successful Bidder, and all rights with respect thereto being expressly

27

reserved).  The inclusion of a contract on the Contract Assumption Notice is not a guarantee that such contract will ultimately be assumed and assigned.   Any determination of whether such contract is an executory contract or unexpired lease that can be assumed, assigned or rejected will be made in accordance with the Bankruptcy Code, the Bankruptcy Rules, and all applicable orders of the Court.

37.    To the extent the Debtor, at any time after the Assumption and Assignment Service Deadline (i) identifies additional Assigned Contracts to be assumed and assigned to the Stalking Horse Bidder or other Successful Bidder, as applicable, or to the Successful Bidder for the Non-Bentracimab Assets (either, the "**Additional Assigned Contracts**"), (ii) removes Assigned Contracts from the list of executory contracts and leases ultimately selected as Assigned Contracts that the Stalking Horse Bidder or a Successful Bidder, as applicable, proposes be assumed and assigned to it in connection with the Sale or the Additional Sale, (iii) and/or modifies the previously stated Cure Amount associated with any Assigned Contract or Separate Assigned Contract, the Debtor will promptly serve by first-class mail a supplemental notice of contract assumption (a "**Supplemental Assumption Notice**") on each of the counterparties to such Assigned Contracts or Separate Assigned Contracts and their counsel of record, if any, and provide a copy of the same to the Stalking Horse Bidder or a Successful Bidder, as applicable. Each Supplemental Assumption Notice will include the same information with respect to listed Assigned Contracts or Separate Assigned Contracts as was included in the Contract Assumption Notice.

38.    The Debtor proposes that any objections to the proposed assumption and assignment or the Cure Amount proposed with respect thereto, must: (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed

Cure Amount, the correct Cure Amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Clerk of this Court and served upon (w) proposed counsel and co-counsel to the Debtor, (x) counsel to the Stalking Horse Bidder, (y) the Notice Parties, and (z) any other party that has filed a notice of appearance in this chapter 11 case, so as actually to be received on or before the Sale Objection Deadline or deadline set forth in the Supplemental Assumption Notice, as applicable.

39.     Any party failing to timely file an objection to the cure amount or the proposed assumption and assignment of an Assigned Contract, Separate Assigned Contract, or Additional Assigned Contract listed on the Contract Assumption Notice is deemed to have consented to: (a) such Cure Amount, (b) the assumption and assignment of such Assigned Contract, Separate Assigned Contract, or Additional Assigned Contract, (c) the related relief requested in the Motion, and (d) the Sale and the Additional Sale.  Such party shall be forever barred and estopped from objecting to the Cure Amounts, the assumption and assignment of the Assigned Contract, Separate Assigned Contract, or Additional Assigned Contract, adequate assurance of future performance, the relief requested in the Motion, whether applicable law excuses such counterparty from accepting performance by, or rendering performance to, the Stalking Horse Bidder or Successful Bidder for the Acquired Assets, as applicable, or the Successful Bidder for the Non-Bentracimab Assets, for purposes of section 365(c)(1) of the Bankruptcy Code, and from asserting any additional cure or other amounts as a claim or otherwise against the Debtor and the Stalking Horse Bidder or Successful Bidder, as applicable, or the Successful Bidder for the Non-Bentracimab Assets, with respect to such party's Assigned Contract, Separate Assigned Contract, or Additional Assigned Contract.

277262451

40.     In the event that the Debtor and the non-Debtor counterparty cannot resolve any objection to the Cure Amount, the Assigned Contract (or Separate Assigned Contract) may be assumed by the Debtor and assigned to the Stalking Horse Bidder or Successful Bidder (or the Successful Bidder for the Non-Bentracimab Assets), as applicable, *provided* that the Debtor shall segregate from the sale proceeds received by the Debtor at the closing of the Sale or the Additional Sale, as applicable, the Cure Amount that the counterparty asserts is required to be paid, pending a resolution of the dispute by the Court or mutual agreement by the parties. Any objection to the proposed assumption and assignment of a contract or related cure amount proposed in connection with the Sale or the Additional Sale that remains unresolved as of the Sale Hearing shall be heard at the Sale Hearing (or at a later date as fixed by the Court).

41.     The Stalking Horse Bidder or Successful Bidder(s) may designate Additional Assigned Contracts to be assumed and assigned, and may remove Assigned Contracts from the list of Assigned Contracts, up to two business days before the commencement of the Auction (or, if no Auction occurs for the Acquired Assets, two business days before the commencement of the Sale Hearing).  No Assigned Contract shall be deemed assumed and assigned pursuant to section 365 of the Bankruptcy Code until the later of: (i) the date the Court has entered an order assuming and assigning such Assigned Contracts or (ii) the date the Sale has closed.

## **RELIEF REQUESTED**

42.     By this Motion, the Debtor seeks entry of (i) the Bidding Procedures Order, (a) approving the Bidding Procedures for the Sale of the Acquired Assets and the Stalking Horse Bid Protections under the Stalking Horse APA, and separately the Additional Sale of the Non-Bentracimab Assets, (b) subject to final Court approval at the Sale Hearing, authorizing the Debtor to enter into (y) the Stalking Horse APA, and (z) the Additional Sale APA with the Successful

277262451

Bidder for the Non-Bentracimab Assets, (c) scheduling a date for the Auction and the Sale Hearing, (d) approving the Sale Hearing Notice, (e) approving the Assumption Procedures, (f) scheduling a hearing to authorize and approve assumption and assignment of the Assigned Contracts and the Separate Assigned Contracts, and (g) granting related relief; (ii) the Sale Order (a) authorizing and approving the Debtor's entry into an asset purchase agreement with the Successful Bidder or Backup Bidder, as applicable, in connection with the Acquired Assets, (b) authorizing the Sale, free and clear of all Encumbrances, (c) authorizing and approving the assumption and assignment of the Assigned Contracts in connection with the Sale, including proposed cure amounts (if any), and (d) granting related relief; and (iii) the Additional Sale Order (a) authorizing and approving the Debtor's entry into the Additional Sale APA with the Successful Bidder or Backup Bidder, as applicable, in connection with the Non-Bentracimab Assets, (b) authorizing the Additional Sale, free and clear of all Encumbrances, (c) authorizing and approving the assumption and assignment of the Separate Assigned Contracts in connection with the Additional Sale, including proposed cure amounts (if any), and (d) granting related relief.

## **BASIS FOR RELIEF REQUESTED**

A.    **Approval of the Sale and Additional Sale is Warranted Under Section 363(b) of the Bankruptcy Code**

43.    Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Under section 363(b), a debtor must demonstrate a sound business justification for a sale or use of its assets outside the ordinary course of business.  *See, e.g.*, *In re Martin*, 91 F.3d 389 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983).

44.     Courts typically consider the following factors in determining whether a proposed sale meets this standard:

      a.      whether a sound business justification exists for the sale;

      b.      whether adequate and reasonable notice of the sale was given to interested parties;

      c.      whether the sale will produce a fair and reasonable price for the property; and

      d.      whether the parties have acted in good faith.

*In re Decora Indus., Inc.*, 2002 WL 32332749, at * 2 (D. Del. May 20, 2002) (citing *Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)).

45.     When a debtor demonstrates a valid business justification for a decision, a strong presumption arises "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that Delaware business judgment rule has "vitality by analogy" in chapter 11) (citations omitted).

46.     The Debtor submits that its decision to pursue the Sale and the Additional Sale on the terms set forth in this Motion represents a reasonable exercise of the Debtor's business judgment and, accordingly, the Sale and the Additional Sale should be approved under section 363(b) of the Bankruptcy Code.  The Debtor will continue to conduct an extensive and fulsome process to market the Acquired Assets and the separate Non-Bentracimab Assets.  The open and fair Auction and sale process contemplated by the Bidding Procedures will ensure that the Debtor's estate receives the highest or best value available for the Acquired Assets and the Non-Bentracimab Assets by allowing the market to dictate the values of these assets.  Furthermore, compliance with the Bidding Procedures will ensure the fairness and reasonableness of the

consideration to be paid by the Successful Bidders and establish that the Debtor and the Successful Bidders proceeded in good faith.

47.     Additionally, the Debtor believes that the notice procedures described above are reasonable and adequate under the circumstances.  Bankruptcy Rules 2002(a) and (c) require the Debtor to notify creditors of the Sale and the Additional Sale, the terms and conditions of the Sale and the Additional Sale, the time and place of the Auction, and the deadline for filing any objections.  The Debtor believes that the proposed notice procedures fully comply with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Sale and the Additional Sale, the Auction, and the Sale Hearing to the Debtor's creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a bona fide interest in acquiring the Acquired Assets and the Non-Bentracimab Assets.  Contemporaneously herewith, the Debtor has filed a motion seeking entry of an order shortening the notice and objection periods with respect to this Motion, and for the reasons stated therein, believes that the proposed notice of this Motion is reasonably calculated to provide adequate notice of the Bidding Procedures under the circumstances.

48.     The Sale and the Additional Sale, conducted in accordance with the Bidding Procedures, will generate maximum value for the Debtor's estate and represents the best path forward for maximizing recoveries.  The Debtor submits that ample business justification exists for the consummation of the Sale and the Additional Sale and therefore request that the Court approve such Sale and Additional Sale.

**B.     The Sale and the Additional Sale Should Be Subject to the Protections of Section 363(m) of the Bankruptcy Code**

49.     Section 363(m) of the Bankruptcy Code provides, in part, that the reversal or modification on appeal of an authorization of a sale pursuant to section 363(b) or section 363(c) of

the Bankruptcy Code does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.  *See* 11 U.S.C. § 363(m).

50.    In approving the Sale and the Additional Sale free and clear of Encumbrances, the Debtor requests that the Court find and hold that all purchasers of the Acquired Assets and the Non-Bentracimab Assets purchased in accordance with the Bidding Procedures are entitled to the protections afforded by section 363(m) of the Bankruptcy Code.  Such relief is appropriate in that selection of the Successful Bidders will be the result of a competitive bidding process and arm's-length, good-faith negotiations, and parties in interest will have the opportunity to review and object to a proposed transaction.  *See Esposito v. Title Ins. Co. of Pa. (In re Fernwood Mkts.)*, 73 B.R. 616, 620 (Bankr. E.D. Pa. 1987) (good faith purchasers are protected under section 363(m) where notice is provided to lienholders).

### C.    The Court Should Approve the Bidding Procedures

51.    The key objective in any sale of property of a debtor's estate is to maximize the value received by the estate.  *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that Debtor "had a fiduciary duty to protect and maximize the estate's Acquired Assets"); *Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (same).  Procedures used to enhance competitive bidding support this objective and, therefore, are appropriate in the context of bankruptcy sales.  *See In re O'Brien Envt'l. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Integrated Res. Inc.*, 147 B.R. at 659 (stating that bidding procedures "encourage bidding and . . . maximize the value of the Debtor' Acquired Assets").

52.    The Debtor and its professional advisors have designed the Bidding Procedures to promote a competitive and fair bidding process and, thus, to maximize value for the Debtor's estate and creditors.   The Bidding Procedures will allow the Debtor to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtor will receive the highest or best possible consideration for the Acquired Assets and the Non-Bentracimab Assets.   Furthermore, the Bidding Procedures provide an appropriate framework for the Debtor and its independent fiduciaries and professional advisors to review, analyze, and compare any Bids received to determine which Bids are in the best interests of the Debtor's estate and its creditors.

53.    The Debtor submits that the Bidding Procedures are necessary and transparent and will solicit the highest or best value for the Acquired Assets and the Non-Bentracimab Assets. Therefore, the Debtor requests that the Court approve the Bidding Procedures.

**D.    The Court Should Approve the Stalking Horse Bid Protections**

54.    As indicated above, the Debtor has agreed to the terms of the Stalking Horse APA, which contemplates the potential sale of the Acquired Assets to the Stalking Horse Bidder.  To compensate the Stalking Horse Bidder whose bid will be subject to higher or better offers, the Debtor seek approval of the Stalking Horse Bid Protections in accordance with the terms of the Stalking Horse APA.

55.    The Debtor and the Stalking Horse Bidder believe that the amount of the Stalking Horse Bid Protections is reasonable given the benefits to the Debtor's estate of having a "stalking horse" bidder set a valuation floor by virtue of the definitive asset purchase agreement with the Stalking Horse Bidder and the risk to the Stalking Horse Bidder that a third-party offer may ultimately be accepted. Approval of the Stalking Horse Bid Protections as described in the Bidding

Procedures is necessary to preserve and enhance the value of the Debtor's estate and is a required condition to induce the Stalking Horse Bidder to enter into the transactions encompassed by the Stalking Horse APA, which in turn will enable the Debtor to obtain the highest and best possible price for the Acquired Assets.  The Debtor further believes that the Stalking Horse Bid Protections are fair and reasonable under all the circumstances.

56.     The Stalking Horse Bid Procedures are reasonably calculated to encourage a buyer to submit a final bid within the range of reasonably anticipated values.  The Stalking Horse Bid Protections will encourage competitive bidding and will potentially lead to further competition and the establishment of a baseline against which higher or otherwise better offers can be measured.

57.     The Third Circuit has established standards for determining the appropriateness of bidding incentives in the bankruptcy context. In *O'Brien*, 181 F.3d 527 (3d Cir. 1999), the court held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context.  Accordingly, to be approved, bidding incentives must provide some benefit to the Debtor's estate. *See id.* at 533.  The *O'Brien* court identified at least two instances in which bidding incentives may provide benefit to an estate.  *First*, benefit may be found if "assurance of a Break-Up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537.  *Second*, where the availability of bidding incentives induces a bidder to research the value a debtor's assets and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth."  *Id.*

58.     Whether evaluated under the "business judgment rule" or the Third Circuit's "administrative expense" standard, the Stalking Horse Bid Protections are appropriate.   The Stalking Horse Bidder required the Debtor to agree to the Stalking Horse Bid Protections as a precondition to entering into the Stalking Horse APA.   The Debtor's agreement to provide the Stalking Horse Bid Protections, following good faith, arm's-length negotiations between the Debtor and the Stalking Horse Bidder, was a critical inducement for the Stalking Horse Bidder to make its bid, which otherwise it would not have made. The Stalking Horse Bid Protections are fair and reasonable in amount and are reasonably intended to compensate for the risk to the Stalking Horse Bidder of being used as a stalking-horse bidder and ultimately losing the transaction to another bidder.

59.     In addition, the Stalking Horse APA provides a substantial benefit to the estate by setting a minimum bid on which other bidders can rely, thereby "increasing the likelihood that the price at which the [Acquired Assets will be] sold will reflect [their] true worth." *Id.* The Stalking Horse Bid Protections, together with the Bidding Procedures, are fair and reasonable and intended to encourage competitive bidding. The Stalking Horse Bid Protections will permit the Debtor to insist that competing bids for the Acquired Assets, made in accordance with the Bidding Procedures, be materially higher or otherwise better than the Stalking Horse APA, which is a clear benefit to the Debtor's estate.

60.     The Stalking Horse Bid Protections are also well within the spectrum of break-up fees and expense reimbursements approved by bankruptcy courts in other chapter 11 cases in this district.[15] *See, e.g.*, *In re American Eagle Delaware Holding Co., LLC*, No. 22-10028 (JKS) (approving a break-up fee of 3% of the cash consideration of the stalking horse bid plus expense

---

[15]   The Break-Up Fee represents 2% of the total cash amount of the Purchase Price and 5% of the $40 million Upfront Payment.

reimbursements equal to a maximum of 1.25% of the cash consideration of the stalking horse bid); *In re Ector Cnty. Energy Ctr., LLC*, No. 22-10320 (JTD) (Bankr. D. Del. May 6, 2022) (approving break-up fee of 3% of cash consideration of the stalking horse bid plus expense reimbursements equal to a maximum of 0.5% of the cash consideration of the stalking horse bid); *In re BHCosmetics Holdings, LLC*, No. 22-10050 (CS) (Bankr. D. Del. Jan. 28, 2022) (approving break-up fee equal to 4% of the cash consideration of the stalking horse bid plus expense reimbursements equal to a maximum of approximately 3.5% of the cash consideration of the stalking horse bid); *In re Gorham Paper and Tissue, LLC*, No. 20-12814 (KBO) (Bankr. D. Del. Nov. 19, 2020) (approving break-up fee in an amount equal to approximately 3.4% of cash purchase price and expense reimbursement up to an amount equal to approximately 1.1% of cash purchase price); *In re Valeritas Holdings, Inc.*, No. 20-10290 (LSS) (Bankr. D. Del. Mar. 6, 2020) (approving 3% break-up fee and $1 million expense reimbursement totaling 7.3% of stalking horse bid); *In re Celadon Grp., Inc.*, No. 19-12606 (KBO) (Bankr. D. Del. Jan. 6, 2020) (authorizing a break-up fee of up to 3% of the purchase price plus an expense reimbursement of 1.5% of the purchase price); *In re Promise Healthcare Grp., LLC*, No 18-12491 (CSS) (Bankr. D. Del. Feb. 1, 2019) (approving break-up fee and expense reimbursement of approximately 3.4% of stalking horse bid); *In re AtopTech, Inc.*, No. 17-10111 (MFW) (Bankr. D. Del. Apr. 21, 2017) (approving break-up fee and expense reimbursement of approximately 5.6% of stalking horse bid); *In re Am. Apparel, LLC*, No. 16-12551 (BLS) (Bankr. D. Del. Dec. 5, 2016) (approving break-up fee and expense reimbursement fee of approximately 4.5% of stalking horse bid); *In re BPS US Holdings Inc.*, No. 16-12373 (KJC) (Bankr. D. Del. Nov. 30, 2016) (approving break-up fee and expense reimbursement of approximately 3.6% of stalking horse bid); *In re Hipcricket, Inc.*, Case No. 15-

10104 (LSS) (Bankr. D. Del., Feb. 11, 2015) (approving break-up fee, which together with expense reimbursement, was 4.3% of the purchase price under stalking horse bid).

### E.    Sale of the Available Assets Free and Clear of All Encumbrances Is Authorized Under Section 363(f) of the Bankruptcy Code

61.    It is well-established that a bankruptcy court has the power, pursuant to section 363(f) of the Bankruptcy Code, to approve the sale of a debtor's assets free and clear of any liens, claims, and encumbrances. *In re TWA Airlines, Inc.*, 322 F.3d 283, 288–90 (3d Cir. 2003) (holding that successor liability claims are "interests in property" within the meaning of section 363(f)); *United Mine Workers of Am. Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573 (4th Cir. 1996) (same).  Pursuant to section 363(f), a debtor-in-possession may sell estate property "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

(i)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(ii)    such entity consents;

(iii)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(iv)    such interest is in bona fide dispute; or

(v)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (because section 363(f) is written in the disjunctive, a court may approve a "free and clear" sale even if only one of the subsections is met).

62.    The Debtor submits that the Sale of the Acquired Assets and the Additional Sale of the Non-Bentracimab Assets, free and clear of any and all liens, claims, interests and

encumbrances, satisfies the requirements of section 363(f) of the Bankruptcy Code and, more specifically, sections 363(f)(2) and 363(f)(4).

### 1.    JMB Has Consented to the Sale and the Additional Sale

63.    Section 363(f)(2) provides that a trustee or a chapter 11 debtor-in-possession, "may sell property . . . free and clear of any interest in such property of an entity other than the estate, only if . . . such entity consents."  11 U.S.C. § 363(f)(2).  Here, JMB, the Debtor's senior secured prepetition lender and the Debtor's postpetition debtor-in-possession lender holds security interests in and liens on substantially all of the Debtor's assets. JMB has consented to the Sale and the Additional Sale free and clear of its liens, with its liens to attach to the proceeds of each sale. Accordingly, the requirement of section 363(f)(2) is satisfied with respect to JMB's interest in the Acquired Assets and the Non-Bentracimab Assets.

### 2.    SFJ's Asserted Interests are Subject to a Bona Fide Dispute

64.    Section 363(f)(4) provides that a trustee or a chapter 11 debtor-in-possession, "may sell property . . . free and clear of any interest in such property of an entity other than the estate, only if . . . such interest is in bona fide dispute."  11 U.S.C. § 363(f)(4).  The Third Circuit has found the existence of a "bona fide dispute" for purposes of section 363(f)(4) when "there is an objective basis—either in law or fact—to cast doubt on the validity of [the asserted interest]."  *In re Revel AC, Inc.*, 802 F.3d 558, 573 (3d Cir. 2015).  "To qualify as a 'bona fide dispute' under § 363(f)(4), 'the propriety of the lien does not necessarily have to be the subject of an immediate or concurrent adversary proceeding.'"  *In re L.L. Murphrey Co.*, 2013 WL 2451368 (Bankr. E.D. N.C. 2013) (quoting *In re Collins*, 180 B.R. 447, 452 n.8 (Bankr. E.D. Va. 1995)); accord *Union Planters Bank, N.A. v. Burns (In re Gaylord Grain LLC)*, 306 B.R. 624, 627 (B.A.P. 8th Cir. 2004). Importantly, section 363(f)(4) also does not require the Court to resolve the underlying dispute or

40

determine the probable outcome of the dispute, but merely to ascertain whether one exists.  *In re Taylor*, 198 B.R. 142, 147 (Bankr. D.S.C. 1996); *see also In re Octagon Roofing*, 123 B.R. 583, 590 (Bankr. N.D. Ill. 1991).

65.    Here, the Debtor has already filed its Adversary Complaint, and SFJ has indicated its intention to file a counterclaim. Courts have held that commencement of an adversary proceeding seeking a declaratory judgment of rights and interests in the property that the debtor is seeking to sell qualifies as a bona fide dispute for purposes of section 363(f)(4).  *See, e.g.*, *In re Daufuskie Island Properties*, 431 B.R. 626, 645–46 (Bankr. D.S.C. 2010) (holding an adversary proceeding commenced by the debtor's contract counterparty to determine its interest in property subject to the debtor's section 363 sale motion gave rise to a bona fide dispute for purposes of section 363(f)(4) and authorized the trustee to consummate the sale pursuant to section 363(b)); *In re Robotics Vision Systems*, 322 B.R. 502 (Bankr. D.N.H. 2005) (finding an adversary complaint filed against the debtor seeking to characterize a settlement agreement as a disguised security interest and not a license gave rise to a bona fide dispute for purposes of section 363(f)(4)).

66.    SFJ's purported interest in the Acquired Assets and the Non-Bentracimab Assets is subject to a bona fide dispute within the meaning of section 363(f)(4).  The Debtor commenced the Adversary Proceeding against SFJ seeking, among other things, a determination by the Court that (a) SFJ's investment with the Debtor under the CDA should be recharacterized as equity; (b) the security interest purporting to secure the Debtor's obligations under the CDA to make the Contingent Return-On-Investment Payments and other amounts is invalid; and that (c) the Trial Data Package is property of the Debtor's estate.  *See, e.g.*, Adversary Complaint ¶ 83.  The Adversary Complaint, together with the First Day Declaration filed by the Debtor, demonstrates in detail that there is both a factual and legal basis for the bona fide dispute as to the validity of

41

SFJ's asserted security interest, as well as any other asserted interest, in the Acquired Assets and the Non-Bentracimab Assets.  Furthermore, SFJ agrees that its security interest, and any purported ownership or other interest, in the Acquired Assets and the Non-Bentracimab Assets is disputed.  *See, e.g.*, Docket No. 44 ¶ 23 (SFJ stating that "SFJ and the Debtor agree that the 'path' for this case must include, as an initial step, an expedited adjudication of SFJ's secured claims."); Docket No. 70 at 2 (SFJ stating that it "is prepared to file an adversary complaint against the Debtor to determine all parties' claims under the CDA promptly.")

67.    "[T]he purpose of section 363(f)(4) is to allow a debtor to sell its assets without the necessity to wait until all disputes are fully resolved because . . . a debtor is often in a precarious financial condition and any delay could erode the value of its assets and potential recovery for creditors."  *In re Nine Point Energy Holdings, Inc.*, No. 21-10570 (MFW), 2021 WL 2212007, at *7 (Bankr. D. Del. June 1, 2021), *aff'd*, 633 B.R. 124 (D. Del. 2021) (citing *In re Southland Royalty Co. LLC*, 623 B.R. 64, 99 (Bankr. D. Del. 2020) ("The goal of § 363(f)(4) is to allow the sale of property subject to dispute so that liquidation of the estate's assets need not be delayed while such disputes are being litigated.")); *see also Moldo v. Clark (In re Clark)*, 266 B.R. 163, 171 (B.A.P. 9th Cir. 2001) (citing 3 Lawrence P. King, Collier on Bankruptcy ¶ 363.06 (15th ed. rev. 1998)). A bona fide dispute exists as to the validity and extent, if any, of SFJ's asserted security interest against, and any asserted ownership or other interest in, the Acquired Assets and the Non-Bentracimab Assets.  Accordingly, although the Trial Data Package ownership issue must be resolved prior to the Sale as part of the Court's overall determination of the rights of the parties under the CDA, section 363(f)(4) authorizes the Sale and the Additional Sale, as applicable, of the Acquired Assets and the Non-Bentracimab Assets free and clear of SFJ's asserted security interest

and any other interests so that the sales are not unnecessarily delayed even if the entire dispute

between the Debtor and SFJ has not been fully adjudicated through the Adversary Proceeding.

**F.    SFJ's Ability to Credit Bid Should be Denied for Cause Under Section 363(k) Given the Bona Fide Dispute Over SFJ's Interest in the Available Assets**

68.    Although section 363(k) of the Bankruptcy Code provides that a secured creditor

may "credit bid" at a sale of estate property, *i.e.*, offset its allowed secured claim against the

purchase price of property sold pursuant to Bankruptcy Code section 363(b), the court may deny

a secured creditor the ability to do so for "cause," as a secured creditor's right to credit bid is not

absolute.  11 U.S.C. § 363(k); *see, e.g.*, *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 315–

16 (3d Cir. 2010) (stating that under section 363(k) "the right to credit bid is not absolute."); *In re

Fisker Auto. Holdings, Inc.*, 510 B.R. 55, 59 (Bankr. D. Del. 2014) (same).

69.    The term "cause" is not defined in the Bankruptcy Code and is left to the courts to

determine on a case-by-case basis.  *In re Olde Prairie Block, LLC*, 464 B.R. 337, 348 (Bankr. N.D.

Ill. 2011).  Generally, a court may deny a creditor "the right to credit bid in the interest of any

policy advanced by the Code, such as to ensure the success of the reorganization or to foster a

competitive bidding environment."  *In re Philadelphia Newspapers, LLC*, 599 F.3d at 316 n.14;

*see also In re Antaeus Technical Servs., Inc.*, 345 B.R. 556, 565 (Bankr. W.D. Va. 2005) (denying

right to credit bid to facilitate "fully competitive" cash auction).

70.    Courts have found "cause" under section 363(k) to bar a secured creditor from

credit bidding when the creditor's lien or claim is questioned or otherwise in dispute.  *See In re CS

Mining, LLC*, 574 B.R. 259, 285 (Bankr. D. Utah 2017) (holding that secured lender, whose lien

and claim were disputed and the subject of adversary proceedings seeking to recharacterize its

claim as equity, was not entitled to credit bid its claim at the sale of the debtor's assets); *In re Daufuskie Island Props.*, *LLC*, 441 B.R. 60, 64 (Bankr. D.S.C. 2010) (holding that a secured creditor, whose lien and claim were disputed and the subject of adversary proceedings, was not entitled to credit bid its claim at the sale of the debtor's assets); *Nat'l Bank of Commerce v. McMullan (In re McMullan)*, 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996) (holding that "at any such sale, [the secured creditor] shall not be entitled to offset any of its claimed liens or security interests under 11 U.S.C. § 363(k) because the validity of its liens and security interests are unresolved."), *aff'd*, 162 F.3d 1164 (8th Cir. 1998); *see also In re Fisker Auto. Holdings, Inc.*, 510 B.R. at 61 ("The law leaves no doubt that the holder of a lien the validity of which has not been determined . . . may not bid its lien."). These cases recognize that it would be unfair to the estate and its myriad stakeholders for a purportedly secured creditor to credit bid for assets, and obtain an offset against the purchase price, based on a secured claim that is later disallowed. *In re Figueroa Mountain Brewing, LLC*, No. 9:20-BK-11208-MB, 2021 WL 2787880, at *8 (Bankr. C.D. Cal. July 2, 2021).

71. In articulating the standard for a "sufficient" or "genuine" dispute for purposes of section 363(k), courts commonly look to the bona fide dispute standard in section 363(f)(4). *See, e.g.*, *In re Figueroa Mountain Brewing, LLC*, 2021 WL 2787880, at *8 (finding the "bona fide dispute" standard of section 363(f)(4) "instructive" and adopting the standard for purposes of determining whether to deny a secured creditor the right to credit bid under section 363(k)); *In re Octagon Roofing*, 123 B.R. at 592 (conditioning credit bid where lien was subject to a "bona fide dispute" within the meaning of Bankruptcy Code section 363(f)(4) on creditor's posting of letter of credit in disputed amount); *see also Ratcliff v. Rancher's Legacy Meat Co.*, No. 20-CV-834 (NEB), 2020 WL 4048509 at *4 (D. Minn. July 20, 2020) ("Bankruptcy courts may also prohibit

credit bidding entirely where the validity of the creditor's lien is genuinely in dispute" and describing the dispute as "*bona fide*") (emphasis added).

72.     Here, SFJ is no ordinary asserted secured creditor.  It made no loan and it holds no promissory note or debt instrument of any kind.  None of the Contingent Return-On-Investment Payments under the CDA have been triggered, and SFJ's claims, if any, are unliquidated and disputed.  This set of facts provides more than sufficient cause for the Court to deny SFJ the right to credit bid.

73.     The Debtor's Adversary Complaint sets forth the reasons the Debtor believes that SFJ has only an equity interest in—and not a claim against—the Debtor's estate, and that the security interest purporting to secure the Contingent Return-On-Investment Payments on SFJ's equity contributions and all other asserted obligations under the CDA is void under section 506(d) of the Bankruptcy Code.  The Adversary Complaint and associated litigation, together with the facts set forth in the First Day Declaration, constitutes a bona fide dispute as to the validity and extent, if any, of SFJ's asserted security interest, and of any other purported interest, in the Debtor's assets.  This bona fide dispute not only establishes "cause" under section 363(k) to deny SFJ the ability to credit bid but also creates a bona fide dispute as to whether SFJ has any allowed secured claim at all.

74.     Allowing SFJ to credit bid a disputed, unliquidated claim that is the subject of pending litigation would frustrate the competitive bidding environment that the Debtor seeks to establish through the Bidding Procedures.  In addition, a condition to the Stalking Horse Bid is that SFJ not be permitted to credit bid, given the clear potential to chill bidding. Courts have denied credit bidding in similar situations, *see, e.g.*, *In re CS Mining, LLC*, 574 B.R. at 285; *In re*

*Daufuskie Island Props.*, *LLC*, 441 B.R. at 64, and "cause" exists here under section 363(k) to deny SFJ the ability to credit bid in connection with both the Sale and the Additional Sale.

G.     **The Assumption and Assignment of the Assigned Contracts and the Separate Assigned Contracts Satisfies Section 365 of the Bankruptcy Code**

75.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g.*, *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim or caprice); *see also In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court").

76.     The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987). Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten a court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any

277262451

default, including compensation for "actual pecuniary loss" relating to such default.  11 U.S.C. § 365(b)(1).

77.    Under section 365(f) of the Bankruptcy Code, a debtor, after assuming a contract, may assign its rights under the contract to a third party.  11 U.S.C. § 365(f); *see also In re Rickel Home Center, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the debtor's estate."); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f) is to assist the trustee in realizing the full value of the debtor's assets).  Section 365(f)(2)(B) requires that the non-Debtor contract counterparty be given adequate assurance of future performance by an assignee.  11 U.S.C. § 365(f)(2)(B).  The purpose of the adequate assurance requirement is to protect the interests of the non-debtor party to an assigned contract, as section 365(k) of the Bankruptcy Code relieves a debtor from liability for any breach of a contract that may occur after an assignment.  *Cinicola v. Scharffeberger*, 248 F.3d 110, 120 (3d Cir. 2001).  Adequate assurance of future performance is not required for every term of an executory contract or unexpired lease, but only such terms that are "material and economically" significant.  *In re Fleming Cos., Inc.*, 499 F.3d 300, 305 (3d Cir. 2007).

78.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction."  *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009); *see also In re Decora Indus.*, 2002 U.S. Dist. LEXIS 27031, at *23 (D. Del. 2002) ("[A]dequate assurance falls short of an absolute guarantee of payment.").  Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (finding that adequate assurance

47

is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of success).

79.     The assumption and assignment of the Assigned Contracts and Separate Assigned Contracts, as applicable, is an appropriate exercise of the Debtor's business judgment.  The Debtor submits that the Assumption Procedures are appropriate and fair to all counterparties and comply in all respects with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  The Contract Assumption Notice is reasonably calculated to: (i) provide sufficient, effective notice to all counterparties and any other affected parties of the Debtor intent to assume and assign to any Successful Bidders some or all of the Assigned Contracts and Separate Assigned Contracts, as applicable, and (ii) afford the counterparties the opportunity to exercise any rights affected by the Motion.

## **WAIVER OF RULES 6004(h) AND 6006(d)**

80.     The Debtor respectfully requests that, upon entry of the Bidding Procedures Order, the Sale Order, and the Additional Sale Order, the Court waive the 14-day stay requirements of Bankruptcy Rules 6004(h) and 6006(d).  The Debtor submits that waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) is necessary to permit the proposed Sale transaction(s) to close expeditiously as possible.

## **NOTICE**

81.     Notice of this Motion will be provided to the following, or their counsel, if known: (i) the U.S. Trustee; (ii) the United States Securities and Exchange Commission; (iii) FDA; (iv) Lowenstein Sandler LLP and Morris James LLP, as counsel to the DIP Lender; (v) counsel to any statutory committee; (vi) the parties included on the Debtor's list of twenty (20) largest unsecured

creditors[16]; (vii) all parties who are known by the Debtor to assert liens against the Acquired Assets

or the Non-Bentracimab Assets; (viii) counsel to SFJ; (ix) any party known or reasonably believed

to have expressed an interest in acquiring the Acquired Assets and the Non-Bentracimab Assets;

and (x) all parties who, as of the filing of this Motion, have filed a notice of appearance and request

for service of papers pursuant to Bankruptcy Rule 2002.

## NO PRIOR REQUEST

82.    No prior request for the relief sought herein has been made to this or any other

court.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Debtor respectfully requests that the

Court (i) grant the relief requested herein and (ii) grant such other and further relief to the Debtor

as the Court may deem proper and just.

*[Remainder of page intentionally left blank]*

---

[16]    The Debtor understands that as of the filing of this Motion the Committee has not selected counsel.  Upon the Committee's selection of counsel the Debtor will promptly serve such counsel with this Motion.

277262451

Dated:  November 4, 2022
      Wilmington, Delaware

Respectfully submitted,

*/s/ Brendan J. Schlauch*
Daniel J. DeFranceschi, Esq. (No. 2732)
Michael J. Merchant, Esq. (No. 3854)
Brendan J. Schlauch, Esq. (No. 6115)
Sarah E. Silveira, Esq. (No. 6580)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701
Email:    defranceschi@rlf.com
        merchant@rlf.com
        schlauch@rlf.com
        silveira@rlf.com
-and-

Cullen Drescher Speckhart, Esq.
Olya Antle, Esq.
**COOLEY LLP**
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
Telephone:  (202) 842-7800
Facsimile:  (202) 842-7899
Email:  cspeckhart@cooley.com
      oantle@cooley.com

-and-

Robert L. Eisenbach III, Esq.
**COOLEY LLP**
3 Embarcadero Center
20th Floor
San Francisco, California 94111
Telephone: (415) 693-2000
Facsimile:  (415) 693-2222
Email:  reisenbach@cooley.com

*Proposed Counsel to the Debtor*

277262451 v5